Felice B. Galant
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019-6022
Tel.: (212) 318-3000
Fax: (212) 318-3400
Email: felice.galant@nortonrosefulbright.com

Matthew H. Kirtland (pending filing of *pro hac vice* application)
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, D.C.  20001
Tel.: (202) 662-0200
Fax: (202) 662-4643
Email: matthew.kirtland@nortonrosefulbright.com

*Attorneys for Petitioner Republic of Kazakhstan*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF REPUBLIC OF KAZAKHSTAN FOR AN ORDER DIRECTING DISCOVERY FROM JEFFERIES & CO. PURSUANT TO 28 U.S.C. § 1782 | Misc. Action No. 18-MC-541 <br><br> ***EX PARTE* PETITION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING PURSUANT TO 28 U.S.C. § 1782** |

Pursuant to 28 U.S.C. § 1782, the Republic of Kazakhstan ("Kazakhstan" or "Petitioner") submits this Petition for an Order Directing Discovery, which seeks an order permitting it to issue subpoena(s) to Jefferies & Co ("Jefferies") that will assist Petitioner in pending foreign legal proceedings. Attached hereto are: a proposed order, a proposed form of a subpoena *duces tecum* (Exhibit A), and the supporting Declaration of Matthew H. Kirtland (Exhibit B).

1

<u>REASONS FOR GRANTING THE PETITION</u>

I.   **PETITIONER'S PURPOSE FOR SEEKING § 1782 DISCOVERY**

1.     Petitioner respectfully requests an order authorizing the issuance of subpoena(s) to Jefferies. Jefferies maintains an office in this judicial district at 520 Madison Avenue, 12th Floor, New York, NY 10022. Kirtland Decl. ¶ 3.

2.     Petitioner requires the requested discovery in connection with foreign legal proceedings that are currently pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy (the "Foreign Proceedings"). *Id*. ¶¶ 4, 7.

   A.   **THE SCC ARBITRATION**

3.     The Foreign Proceedings arise out of a prior international arbitration that Anatolie Stati, Gabriel Stati, Ascom Group, S.A. ("Ascom"), and Terra Raf Trans Traiding Ltd. (collectively "the Stati Parties") commenced against Petitioner before the Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC Arbitration"). *Id*. ¶ 7.

4.     In the SCC Arbitration, the Stati Parties demanded compensation for alleged expropriation of certain assets in Kazakhstan. *Id.* ¶ 8. One of the assets for which the Stati Parties sought compensation was a liquefied petroleum gas plant (the "LPG Plant"). *Id.*

5.     On December 19, 2013, an award was issued in the SCC Arbitration in favor of the Stati Parties, and against Petitioner (the "SCC Award"). *Id.* ¶ 9. As part of the SCC Award, the Tribunal, as a result of various representations by the Stati Parties, awarded $199 million to the Stati Parties in compensation for the LPG Plant. *Id.*

6.     The Stati Parties have initiated proceedings to enforce the SCC Award in multiple jurisdictions, including in Belgium, Luxembourg, the Netherlands, and Italy. *Id.* ¶ 10. In these proceedings, Kazakhstan contends that the Stati Parties procured the SCC Award by fraud and

that the SCC Award is therefore unenforceable.[1] *Id.* For example, Kazakhstan contends that (a) the Stati Parties used a number of schemes to fraudulently inflate the construction costs of the LPG Plant, including through multiple related-party transactions with a sham company called Perkwood Investment Limited ("Perkwood"); (b) throughout the SCC Arbitration, the Stati Parties fraudulently claimed that they had invested over $245 million in the LPG Plant using fabricated evidence; (c) the Stati Parties communicated the fraudulently inflated LPG construction costs to their auditor and thereby obtained falsified financial statements, which they also relied upon in the SCC Arbitration; (d) before the SCC Arbitration commenced, the Stati Parties used the falsified financial statements to procure an indicative bid from the Kazakh state-owned company KazMunaiGas ("KMG") for the LPG Plant in the amount of $199 million; and (e) the Stati Parties used this fraudulently obtained KMG indicative bid in the SCC Arbitration to obtain the SCC Award, which included $199 million in compensation for the LPG Plant. *Id.*

       7.     Kazakhstan submitted evidence supporting these contentions to the High Court of Justice (the "English High Court") in proceedings initiated by the Stati Parties in England to enforce the SCC Award (the "London Proceedings"). *Id.* In February 2017, the English High

---

[1] The Stati Parties also filed proceedings to enforce the SCC Award in the United States in two actions, one before the United States District Court for the District of Columbia, which is captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, No. 1:14-cv-1638-ABJ (D.D.C.), and one in the United States District Court for the Southern District of New York, which is captioned *Anatolie Stati et al. v. Republic of Kazakhstan*, 1:17-cv-05742-RA (S.D.N.Y.). In the D.D.C. action, the SCC Award was confirmed after the court denied Kazakhstan the right to present evidence of the Stati Parties' fraud. *See* Order Denying Motion for Leave (ECF 36); Order Denying Motion for Reconsideration (ECF 69). That ruling is on appeal to the United States Courts of Appeals for the District of Columbia Circuit (No. 18-7047). In the S.D.N.Y. case, the Stati Parties have sought to enforce the SCC Award under the New York Foreign Country Money Judgment Recognition Act (ECF 1). By order dated September 5, 2018, that case was stayed pending resolution of the D.C. Circuit appeal (ECF 32). Also, on October 5, 2017, Kazakhstan filed a complaint in the D.D.C. against the Stati Parties alleging that their fraudulent conduct violated, inter alia, the Racketeer Influenced and Corrupt Organizations ("RICO") Act, which case is captioned *Republic of Kazakhstan v. Anatolie Stati et al.*, No. 1:l7-cv-02067-ABJ (D.D.C.).

Court held a two-day hearing in which it carefully considered Kazakhstan's evidence. *Id.* Four months later, the court ruled in Kazakhstan's favor, finding that Kazakhstan had presented a prima facie case that the Stati Parties obtained the SCC Award by fraud. *Id.* The English High Court concluded the fraud allegations needed to be examined at trial and decided on their merits, and set a trial date of October 31, 2018. *Id.* However, on February 28, 2018, just several days before a deadline for document disclosure, the Stati Parties unexpectedly filed a notice seeking to voluntarily discontinue their enforcement case. *Id.* The London Proceedings have since been discontinued. *Id.*

8.      Further details regarding the ongoing proceedings in Belgium, Luxembourg, the Netherlands, and Italy are set out below.

**B.      THE PROCEEDINGS IN BELGIUM**

9.      On September 29, 2017, the Stati Parties filed an *ex parte* application for permission to make a pre-judgment attachment (in the form of a preliminary garnishment) against Kazakhstan before the Attachment Judge of the Dutch Language Court of First Instance in Brussels (the "Brussels Court"). *Id.* ¶ 11. Specifically, the Stati Parties requested permission to proceed to a conservatory garnishment against Kazakhstan, including on the National Fund of Kazakhstan ("National Fund") held by the Bank of New York SA/NV ("BNY Mellon"). *Id.*

10.      On October 11, 2017, the Brussels Court issued the *ex parte* garnishment order requested by the Stati Parties. *Id.* ¶ 12.

11.      On October 13, 2017, the Stati Parties served the garnishment order on BNY Mellon. *Id.* ¶ 13.

12.      In late October 2017, in response to the garnishment order, BNY Mellon issued an undated declaration stating that it had frozen National Fund cash and securities accounts in the amount of approximately $22 billion (including $589 million in cash). *Id.* ¶ 14.

13.     On November 13, 2017, the Stati Parties also filed an *ex parte* application with the French Language Court of First Instance in Brussels for an exequatur order to enforce the SCC Award. *Id.* ¶ 15.

14.     On November 20, 2017, Kazakhstan filed an application to set aside the October 11, 2017 pre-judgment garnishment order. *Id.* ¶ 16. Kazakhstan contends, in these set-aside proceedings, that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud. *Id.*

15.     On December 11, 2017, the French Language Court of First Instance in Brussels granted the Stati Parties' exequatur order *ex parte*, stating that Kazakhstan was free to file an opposition to the order. *Id.* ¶ 17. Thereafter, Kazakhstan filed an application to set aside the exequatur order on February 2, 2018, and a preliminary procedural hearing was held on Kazakhstan's application on March 13, 2018. *Id.*

16.     On April 27, 2018, a hearing was held on the merits of Kazakhstan's application to set aside the pre-judgment garnishment order. *Id.* ¶ 18.

17.     On May 25, 2018, the Brussels Court issued a judgment that confirmed the garnishment but limited it to the amount of the Stati Parties' claim on the SCC Award, which was quantified as $530 million in total. *Id.* ¶ 19. BNY Mellon then released the garnishment except as to $530 million in cash. *Id.*

18.     The hearing on Kazakhstan's application to set aside the exequatur order obtained by the Stati Parties is scheduled to be held in May 2019. *Id.* ¶ 20. As set forth above, Kazakhstan contends in these proceedings that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud.

### C.   THE PROCEEDINGS IN LUXEMBOURG

19.     On August 16, 2017, in proceedings initiated by the Stati Parties, the Luxembourg court bailiff served attachments freezing certain receivables due to Kazakhstan from Luxembourg-based entities (the value of which are not precisely known), including the entity Eurasian Resources Group S.a.r.l. *Id.* ¶ 21.

20.     On August 24, 2017, the Stati Parties filed an *ex parte* request for exequatur of the SCC Award with the President of the Luxembourg District Tribunal. *Id.* ¶ 22. On August 30, 2017, the Tribunal issued the exequatur order *ex parte*. *Id.*

21.     Subsequently, the Stati Parties served the exequatur order on Kazakhstan. *Id.* ¶ 23.

22.     On November 2, 2017, Kazakhstan filed an appeal of the exequatur order. *Id.* ¶ 24.

23.     The parties are now engaging in briefing and hearings on the Stati Parties' application for exequatur on a schedule set by the Luxembourg court. *Id.* ¶ 25. Kazakhstan is contending in these proceedings that the SCC Award is unenforceable and therefore should not be granted exequatur because (among other reasons) the Stati Parties procured the SCC Award by fraud. *Id.* A hearing on this issue is expected to be scheduled in 2019. *Id.*

### D.   THE PROCEEDINGS IN THE NETHERLANDS

24.     On August 31, 2017, the Stati Parties filed an *ex parte* application in the Court of Summary Proceedings of Amsterdam (the "Dutch Court") for permission to make a pre-judgment attachment (in the form of a preliminary garnishment) against Kazakhstan. *Id.* ¶ 26. Specifically, the Stati Parties requested permission to proceed to a pre-judgment attachment against assets held by BNY Mellon for Kazakhstan or as part of the National Fund, and shares held by the Samruk-Kazyna JSC ("Samruk") in KMG Kashagan B.V. ("KMGK"). *Id*. The Stati

Parties claimed that a pre-judgment attachment against Samruk should be possible due to an alleged unity of identity between Kazakhstan and Samruk. *Id.*

25.     On September 8, 2017, the Dutch Court ex parte issued the attachment order requested by the Stati Parties, subject to the condition that the Stati Parties initiate proceedings to obtain an exequatur order within a specified period of time. *Id.* ¶ 27.

26.     On September 14, 2017, the Stati Parties served ex parte the attachment order on the assets held by BNY Mellon with a value of $22 billion and shares held by Samruk in KMGK, which are valued in excess of $5 billion. *Id.* ¶ 28.

27.     On September 26, 2017, the Stati Parties filed an application with the Amsterdam Court of Appeal (the "Dutch Court of Appeal") for an exequatur order to enforce the SCC Award against Kazakhstan and Samruk (the "Exequatur Proceedings"). *Id.* ¶ 29.

28.     Following the Stati Parties' attachment on September 14, 2017, BNY Mellon issued a garnishment declaration on October, 12, 2017. *Id.* ¶ 30. In this declaration, BNY Mellon declared that the attachment did not have any effect because – briefly put – there is no legal relationship between BNY Mellon and Kazakhstan. *Id.* Thereafter, the Stati Parties insisted with BNY Mellon by letters dated October, 18 and 19, 2017, that BNY Mellon change its declaration. *Id.* On November 1, 2017, BNY Mellon changed its declaration and froze the bank and securities accounts of the National Fund with a value of $22 billion because of what BNY Mellon stated were "*uncertainties.*"  *Id.* In December 2017, the National Bank of Kazakhstan filed an application for interim proceedings to lift the attachments on its bank and securities accounts (the "NBK Attachment Proceedings"). *Id.*

29.     On January 23, 2018, the Dutch Court granted the NBK's application to have the attachments lifted, based on two separate grounds. *Id.* ¶ 31. First, the Dutch Court lifted the

attachment because the bank accounts at BNY Mellon do not belong to Kazakhstan(the purported debtor of the Stati Parties), but to the National Bank of Kazakhstan. *Id.* Second, the Dutch Court lifted the attachment because the Stati Parties failed to disclose, in spite of their duty to be truthful pursuant Dutch law, that the same bank accounts had been subject to a previous failed attempt by the Stati Parties to levy attachments in 2014. *Id.*

30.     On February 20, 2018, the Stati Parties filed a notice of appeal declaring that they were going to appeal the January 23, 2018 judgment of the Dutch Court. *Id.* ¶ 32. However, on June 5, 2018, shortly before the Stati Parties were due to submit their statement of appeal, they applied to the Dutch Court of Appeal to strike their case from the court docket. *Id.*

31.     The National Bank of Kazakhstan has now initiated damages proceedings against the Stati Parties for an amount of approximately $118 million based on the unlawful attachment of assets of the National Bank of Kazakhstan. *Id.* ¶ 33.

32.     On November 8, 2017, Samruk filed an application for interim proceedings to set aside the pre-judgment attachment order (the "Samruk Attachment Proceedings"). *Id.* ¶ 34. On December 5, 2017, a hearing was held before the Dutch Court on the merits of Samruk's application to set aside the pre-judgment attachment order. *Id.* The court denied Samruk's application on January 5, 2018, and Samruk appealed this denial on February 2, 2018. *Id.* On April 10, 2018, Kazakhstan filed an application to join the appeal, which was granted on June 5, 2018. *Id.*

33.     On December 7, 2017, the Stati Parties issued main proceedings against Samruk before the Amsterdam District Court to obtain a declaration in law that there is unity of identity between Kazakhstan and Samruk. *Id.* ¶ 35.

34.     On June 15, 2018, Kazakhstan and Samruk each submitted statements of defense. *Id.* ¶ 36. On the same date, the National Bank of Kazakhstan submitted a statement of defense as an interested party. *Id.*

35.     On June 22, 2018, a hearing was held in the Exequatur Proceedings. *Id.* ¶ 37. Therein, Kazakhstan is contending that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud. *Id.*

36.     On July 31, 2018, Kazakhstan filed its appeal brief with the Dutch Court of Appeal in the Attachment Proceeding. *Id.* ¶ 38. The Stati Parties filed their statement of defense on September 11, 2018. *Id.*

37.     On November 6, 2018, the Dutch Court of Appeal issued a decision in the Exequatur Proceedings, in which it *inter alia* granted Kazakhstan the opportunity to substantiate its fraud claim following disclosures of further documents by the Stati Parties. *Id.* ¶ 39. The decision means that the Dutch Court of Appeal will not render a judgment on the Stati Parties' application to enforce the SCC Award without an in-depth examination of all evidence relevant to Kazakhstan's claim that the award was obtained by the Stati Parties' fraud. *Id.* In this respect, the Dutch Court of Appeal set a February 5, 2019 date for Kazakhstan to make further written submissions on its fraud claim, and ordered that an oral hearing would take place thereafter. *Id.*

E.     **PROCEEDINGS IN ITALY**

38.     On January 29, 2018, by means of Presidential Decree No. 1287/2018 (the "Decree"), the Court of Appeal of Rome upheld the Stati Parties' *ex parte* application under Article 839 ICCP and declared the SCC Award "recognized" in Italy. *Id.* ¶ 40.

39.      On May 14, 2018, Kazakhstan filed an application to challenge the recognition of the SCC Award in Italy, commencing proceedings before the Court of Appeal of Rome. *Id.* ¶ 41. Therein, Kazakhstan contends that the SCC Award is unenforceable and should not be

recognized  because the Stati Parties procured it by fraud. *Id.* In particular, Kazakhstan contends that recognition of the SCC Award in Italy is contrary to Italian public policy since it (i) was the result of a fraudulent scheme and (ii) was based on false information and evidence provided by the Stati Parties to the Arbitral Tribunal. *Id.*

40.     On October 17, 2018, the Stati Parties filed their statement of defense to Kazakhstan's application. *Id.* ¶ 42.  A hearing was held on November 7, 2018, during which the court ordered additional briefing. *Id.* Further hearings and proceedings are therefore pending in this case. *Id.*

**F.     DOCUMENTS IN THE POSSESSION, CUSTODY, AND CONTROL OF JEFFERIES**

41.     As set forth below, upon information and belief, Jefferies is in possession, custody, and control of documents evidencing or otherwise relating to the Stati Parties' investments in the LPG Plant, the Stati Parties' financial statements, and the Stati Parties' attempt to enforce the fraudulently obtained SCC Award.

42.     To fund their investments in Kazakhstan, including the LPG Plant, the Stati Parties raised money from investors. Specifically, the Stati Parties, acting through companies that they controlled—Tristan Oil Ltd. ("Tristan"), Kazpolmunay LLP ("KPM"), and Tolkynneftegaz LLP ("TNG")—entered into an Indenture with Wells Fargo Bank, National Association ("Wells Fargo"). *Id.* ¶ 43 & Attachment 1 thereto. Wells Fargo served as the trustee. *Id.* ¶ 43 & Attachment 1 thereto. KPM and TNG served as guarantors of Tristan's obligations under the Indenture. *Id.* ¶ 43 & Attachment 1 thereto.

43.     Pursuant to the Indenture and its amendments, on December 20, 2006 and June 7, 2007, Tristan sold notes ("Existing Notes") to multiple investors (the "Existing Noteholders") totaling $420,000,000. *Id.* ¶ 44. Jefferies facilitated the offering of the Existing Notes. *Id.* In that

capacity, Jefferies distributed the offering circular and was the initial purchaser of the Existing Notes. *Id.*

44.     Also pursuant to the Indenture and its amendments, on June 19, 2009, Tristan issued additional notes with a nominal value of $111,110,000 ("New Notes") to Laren Holdings Ltd. ("Laren"). *Id.* ¶ 45. Laren paid only $30,000,000 for the New Notes, thereby securing a discount of approximately 73% on their face value. *Id.*

45.     The funds which were used to purchase the New Notes originated from a credit facility in the amount of $60,000,000, extended from seven lenders to Laren with an interest rate of 35% per annum (the "Laren Loan"). *Id.* ¶ 46. The seven lenders were Avelade Holdings Ltd ($7,000,000); GLG Atlas Macro Fund ($14,500,000); GLG Atlas Value & Recovery Fund ($16,500,000); Renaissance Securities (Cyprus) Limited ($2,300,000); Vision Advisors III Ltd ($13,700,000); Alder Shipping Ltd ($1,000,000); and Sputnik Group Ltd ($5,000,000) (collectively "Lenders").[2] *Id.*

46.     The New Notes, representing $111,110,000 aggregate principal, were then issued to Avelade Holdings Ltd ("Avelade") ($12,963,000); GLG Atlas Macro Fund ($25,926,000); Renaissance Securities (Cyprus) Limited ($22,222,000); Renaissance Securities (Cyprus) Limited ($15,370,000); Vision Advisors III Ltd ($25,370,000); and Sputnik Group Ltd ("Sputnik Group") ($9,259,000) (collectively, "New Noteholders"). *Id.* ¶ 47 & Attachment 2 thereto. Three of these New Noteholders, all of whom were also Lenders—Renaissance Securities (Cyprus) Limited, Sputnik Group, and Avelade—are affiliated with Renaissance Capital. *Id.* ¶ 47.

47.     The Laren Loan and issuance of the New Notes, together, is referred to herein as the "Laren Transaction." Anatolie Stati negotiated key terms of the Laren Transaction. *Id.* ¶ 48.

---

[2] Alder Shipping Ltd. apparently did not receive New Notes. *Id.* ¶ 46 n.1.

48.    Linklaters LLP ("Linklaters") served as custodian for the New Noteholders during the Laren Transaction. *Id.* ¶ 49. Linklaters also advised Renaissance Capital and Anatolie Stati in setting up the Laren Transaction. *Id.*

49.    On December 17, 2012, the Stati Parties and Tristan, on the one side, and certain of the Existing and New Noteholders, on the other side, entered into a so-called "Sharing Agreement and Assignment of Rights" (the "Sharing Agreement"). *Id.* ¶ 50 & Attachment 3 thereto. Under the Sharing Agreement, any amounts collected by the Stati Parties on the SCC Award are to be paid on an account administered by a security agent. *Id.* ¶ 50 & Attachment 3 thereto. The Sharing Agreement provides for a mechanism of the distribution of the proceeds paid into the account among the Stati Parties and the Noteholders. *Id.* ¶ 50 & Attachment 3 thereto.

50.    The discovery that Petitioner seeks from Jefferies in the present Petition concerns information that relates to the Stati Parties' investment in the LPG Plant, the Stati Parties' financial statements, and the Stati Parties' attempt to enforce the SCC Award. As referenced above, Jefferies facilitated the offering of the Existing Notes. Specifically, Jefferies distributed the offering circular and was the initial purchaser of the Existing Notes.

51.    Specifically, Petitioner seeks:

    a.    all communications with the Stati Parties;

    b.    all communications with any representatives or persons working on behalf of the Stati Parties or any entities controlled by the Stati Parties (such as Tristan, KPM, TNG, and Perkwood), including but not limited to any attorneys for the Stati Parties or any attorneys for entities controlled by the Stati Parties;

c.      all documents related to the issuance of any Notes, New or Existing, pursuant to the Indenture and any amendments thereto, including all communications with Existing Noteholders and New Noteholders;

d.      all documents related to the LPG Plant;

e.      all resolutions of Tristan's board of directors set forth in an Officers' Certificate pursuant to Section 4.12 of the Indenture;

f.      all fairness opinions rendered pursuant to Section 4.12 of the Indenture;

g.      all financial statements of Stati-controlled entities, including but not limited to the financial statements of KPM, TNG, and Tristan, produced pursuant to Section 4.03(a) of the Indenture;

h.      all reserve reports produced pursuant to Section 4.03(a) of the Indenture;

i.      all Officers' Certificates delivered pursuant to Section 4.04(a) of the Indenture;

j.      all written statements made by Tristan's independent public accountants pursuant to Section 4.04(b) of the Indenture;

k.      all documents relating to Perkwood—the sham company through which the Stati Parties effected the fraud;

l.      all documents relating to Laren, the Laren Loan, and the Laren Transaction, including but not limited to internal communications and communications with the Stati Parties, Tristan, KPM, TNG, Wells Fargo, Linklaters, Renaissance Capital, the Lenders, and the New Noteholders;

m.      all documents reflecting the Stati Parties' attempts to enforce the SCC Award, including the funding for the same;

       n.     all documents relating to any fraud or allegations of fraud committed by the Stati Parties and any entities controlled by the Stati Parties, including but not limited to Tristan, KPM, TNG, and Perkwood.

52.     This is a readily defined and concise set of documents. Likewise, any requested depositions related to these documents and will be equally concise.

## II.   THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED

53.     To authorize discovery under 28 U.S.C. § 1782, three requirements must be met: (1) the application must be made by an interested party or upon application of a foreign or international tribunal; (2) the party from whom discovery is sought must "reside" or be "found" in the jurisdiction of the district court where the § 1782 petition has been filed; and (3) the document or testimony must be for "use" in a foreign or international tribunal. All three requirements are met here.

54.     First, Petitioner is an "interested party" because it was a party to the SCC Arbitration and is a party to the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. Kirtland Decl. ¶ 7.

55.     Second, Jefferies is "found" or "resides" in this jurisdiction. Jefferies maintains an office at 520 Madison Avenue, 12th Floor, New York, NY 10022. *Id.* ¶ 3.

56.     Third, the documents sought by Petitioner are "for use" in the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. *Id.* ¶ 4. Specifically, the requested documents will be used by Petitioner to support its contention that the SCC Award was procured by fraud and therefore is not enforceable. *Id.* Likewise, any depositions sought to be taken will relate to these documents, as will any follow-up subpoenas for documents or depositions. *Id.*

### III.    THE *INTEL* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

57.    The Supreme Court has identified four discretionary factors that a district court must consider when ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether discovery would be unduly intrusive or burdensome. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004). Here, all four factors weigh in favor of granting the Petition.

58.    First, Jefferies is not a participant in the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. Kirtland Decl. ¶ 5. *Cf. Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

59.    Second, there is no indication, or reason to believe, that the courts of Belgium, Luxembourg, the Netherlands, or Italy would be unreceptive to judicial assistance by § 1782 discovery. Kirtland Decl. ¶ 6.

60.    Third, this request is not sought to, and does not have the effect of, circumventing any foreign proof-gathering restrictions or other policies. *Id.*

61.    Lastly, this request is not unduly burdensome or intrusive. It seeks a discrete category of discovery in the possession, custody and control of Jefferies. *Id.* ¶ 5. Furthermore, Jefferies, the recipient of the subpoena, will have all of its rights protected under Federal Rule of Civil Procedure 45. The *Intel* factors thus weigh in favor of granting the Petition.

## CONCLUSION

WHEREFORE, because the Petition complies with the requirements of 28 U.S.C. § 1782, and the discretionary factors weigh in favor of it being granted, Petitioner respectfully moves the Court to issue the attached order granting the Petition, authorizing the issuance of the subpoena in the form attached hereto as Exhibit A, and authorizing Petitioner to issue additional subpoenas for the production of documents and/or depositions of Jefferies as Petitioner reasonably deems appropriate and as is consistent with the Federal Rules of Civil Procedure.

Dated: November 21, 2018
       New York, New York

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

By: /s/ Felice B. Galant

Felice B. Galant
1301 Avenue of the Americas
New York, New York 10019
Tel.: (212) 318-3000
Fax: (212) 318-3400
felice.galant@nortonrosefulbright.com

OF COUNSEL:
Matthew H. Kirtland (pending filing of *pro hac vice* application)
799 9th Street NW, Suite 1000
Washington, D.C. 20001
Tel.: (202) 662-0200
Fax: (202) 662-4642
matthew.kirtland@nortonrosefulbright.com

*Attorneys for Petitioner Republic of Kazakhstan*